UNITED STATES of America, Appellee,

v.

Larry E. BROOKS, Sr., Defendant–Appellant.

No. 191, Docket 95–1042.

United States Court of Appeals,
Second Circuit.

Argued Sept. 19, 1995.

Decided April 22, 1996.

Thomas S. Duszkiewicz, Assistant United States Attorney, Buffalo, New York (Patrick H. NeMoyer, United States Attorney for the Western District of New York, of counsel), for Appellee.

Jane Simkin Smith, Millbrook, New York, for Defendant–Appellant.

Before: LUMBARD, MINER and MAHONEY, Circuit Judges.

LUMBARD, Circuit Judge:

Larry E. Brooks appeals from a judgment of conviction entered in the Western District of New York, Skretny, *J.*, on December 6, 1994, after a jury trial. Brooks was convicted of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, and of distribution of 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. He was sentenced to two concurrent prison terms of 78 months, five years supervised release, and a mandatory special assessment of $100. Brooks argues that his trial counsel was ineffective and that he was denied his Sixth Amendment right of Confrontation when the district court failed to strike the direct testimony of a prosecution witness after the witness asserted his

Fifth Amendment privilege on cross examination. We affirm.

The government's principal witnesses at trial were Drug Enforcement Administration (DEA) agent Michael Johnson, and accomplices Terry Williams and Damon Askew, both of whom pleaded guilty—Williams to conspiracy, and Askew to distribution.

According to their testimony, in August 1992, Larry Odett, a confidential informant, asked his co-worker Williams to help him buy some cocaine. Williams contacted Askew, who agreed to supply an ounce of cocaine for $1,200. Odett, Williams and Askew arranged to complete the drug sale the night of August 27, 1992 outside a post office in Buffalo.

At 8:00 p.m., Askew and Williams brought the cocaine to the post office, where Odett and agent Johnson were waiting in the parking lot. After concluding the sale, Johnson, who was posing as the manager of Calico Jack's bar in the nearby town of Hanover, asked about purchasing an additional kilogram of cocaine. Johnson said he would like them to bring the kilogram to Calico Jack's in Hanover, because he felt safer there. They set a tentative price of $25–26,000 for a kilogram.

On the phone later that night, Askew told Johnson that his cocaine source wanted $30,-000. Johnson agreed and Askew said he would bring the cocaine out to Calico Jack's around 12:30 a.m. DEA agents and local police set up surveillance around Calico Jack's parking lot. Johnson was waiting there when Askew drove up around 12:30 a.m. In the car with him were Williams and Larry Brooks. Askew introduced Johnson to Brooks.

Johnson testified that Brooks controlled the sale. Brooks declined Johnson's invitation for a drink, stating that he wanted to close the deal. Johnson said that either Askew or Williams got the cocaine from the car and gave it to Brooks, who handed it to Johnson. Brooks showed Johnson how to remove the duct tape around the cocaine so Johnson could examine it. Johnson returned the cocaine to Brooks, who threw it in the car. DEA agents then arrested Brooks, Askew, and Williams.

Jacob Holmes, an FBI fingerprint specialist, testified that he found ten fingerprints on the brown bag that contained the cocaine and that all ten prints belonged to Brooks. No other fingerprints were found on the bag.

On direct, Askew testified that Brooks and an unnamed friend of Askew's brought him the kilogram on the night of the 27th, and that Brooks's job was to go to the sale and collect the drug money. Askew claimed, however, that he was unable to see or hear the transaction in Calico Jack's parking lot because he walked away from the car after they arrived. He also testified about statements he made to the police after his arrest, in which he said that Tyrone Brown was the source of the kilogram and that Brown sent Brooks along to the drug sale.

On cross examination, Brooks's lawyer sought to show that Brooks was an innocent bystander and that Askew had gotten the cocaine from a source in New York City and had made up the story about Brooks and Brown to give the police what they wanted to hear. Brooks's lawyer asked if Askew brought drugs back from a trip to New York City that he made shortly before the August 27–28th sales. Askew twice responded "no," and said he made no other trips to New York City in July or August of 1992. He said he asked Tyrone Brown for a kilogram of cocaine on the night of the 27th, and Brown said it would be delivered to him. Later around 11:30 p.m., "someone" came to his door and said Brown was waiting for him outside. Askew went out and got the kilogram from Brown.

When Brooks's lawyer asked Askew if he had bought drugs from Brown on other occasions, Askew asserted his Fifth Amendment privilege. The court rejected a request by Brooks's lawyer to instruct him to answer, observing to Askew's lawyer:

[in] an area where it's ... within reason related to the plea and the subject matter of this case and not unrelated by virtue of some other transactions, the [Fifth Amendment] privilege will not apply.... I take it your client and you will be consulting on the matter of claiming a privilege in an area that would clearly not be within reasonable relationship within the

subject matter of this case, ... and that's the way you intend to do it.

The court twice instructed the jury not to consider Askew's assertion of his Fifth Amendment privilege as evidence of Brooks's guilt or innocence. Regarding the sale at Calico Jack's, Askew testified that he heard Brooks say "hurry up, so I can go home." He also said that he gave the cocaine to Johnson, who gave it back to him, and that he then put it in the car.

On redirect, Askew said that Brooks was the person who came to his house and told him that Brown was outside waiting for him. Askew had never met Brooks before. After Askew received the cocaine, he walked back to his home with Brown and Brooks. Brown said he was sending Brooks along to the drug sale and left Brooks with Askew.

Terry Williams testified that he left work at 11:00 p.m. on the night of the 27th and was waiting in Askew's house when Askew returned from his meeting with Brown. Askew persuaded him to come to Hanover. Askew introduced Williams to Brooks, who was waiting in the car, and said he was a basketball friend. Williams was surprised to see Brooks, whom he had never met although he had played basketball before with Askew. Williams placed Brooks at the Hanover drug sale, affirming that Brooks and Askew drove with him out there that night. However, he did not observe the transaction between Johnson, Brooks, and Askew.

Brooks did not testify.

In the jury charge, the court gave an instruction regarding conscious avoidance of knowledge, and a general instruction on the law of conspiracy, which included language to the effect that if the jury found there was a conspiracy that included the defendant, it could consider the actions and statements of any co-conspirators in deciding whether the defendant was guilty.

On appeal, Brooks argues that his trial counsel's performance was so deficient that it violated his right to effective assistance un-der the Sixth Amendment. He complains of three omissions by his trial lawyer: the failure to object to two hearsay statements by Askew, the failure to object to various aspects of the jury charge, and the failure to move to strike Askew's direct testimony after he asserted the Fifth Amendment privilege during cross examination. Brooks also contends that the trial court's failure to strike Askew's direct testimony after his assertion of the Fifth Amendment privilege violated his Sixth Amendment right to confront Askew. We affirm.

### 1. Failure to object to two hearsay statements

Brooks argues that his lawyer should have objected to Askew's testimony on his out-of-court statements to the police, in which he acknowledged that Tyrone Brown was the source of the kilogram and said that Brown sent Brooks to the sale. Askew had already testified that Brooks came along with the supplier of the cocaine and that Brooks came to the Hanover sale to collect the money. Since Askew's out-of-court statements covered the same facts that he already testified to in an admissible form, there is no "reasonable probability that ... the result of the proceeding would have been different," *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), even if these statements had been excluded.

Brooks contends his lawyer should have objected when Askew testified about Brown's out-of-court statement that he was sending Brooks along to the sale. But Brown's statement was admissible against Brooks as an admission by a co-conspirator.[1] There was sufficient evidence to show a conspiracy between Brooks and Brown. Askew testified that Brooks came to Askew's door to tell him Brown was waiting for him, that Brooks brought the cocaine along with Brown, and that Brooks's job was to collect the money. Agent Johnson testified that Brooks was in control of the second sale, and

---

1. Fed.R.Evid. 801(d)(2)(E) provides that
   A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
   Fed.R.Evid. 801(d)(2)(E).

the FBI expert testified that Brooks's fingerprints were found on the cocaine bag. In addition, Brown's statement itself can be considered to determine whether there was a conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 178–79, 107 S.Ct. 2775, 2780–81, 97 L.Ed.2d 144 (1987). Counsel acted properly in not objecting to this part of Askew's testimony since the testimony was admissible.

### 2. Failure to object to the jury instructions

Brooks argues that his lawyer should have objected to three parts of the jury charge: the instruction on the law of conspiracy, the instructions not to consider Askew's assertion of the Fifth Amendment privilege, and the instruction on conscious avoidance of knowledge.

■ The charge on the law of conspiracy, which instructed the jury that if it found Brooks was part of a conspiracy it could consider the actions and statements of co-conspirators in deciding Brooks's guilt or innocence, was proper. The charge was a standard recitation of the vicarious liability aspects of conspiracy law, modeled on instruction 19–9 from 1 L. Sand, et al., Modern Federal Jury Instructions, p. 19–69.

■ There was no compelling reason for Brooks's lawyer to object either to the instructions not to consider Askew's assertion of the Fifth Amendment privilege or to the charge on conscious avoidance of knowledge. Brooks's lawyer might well have thought that Askew's assertion of the privilege was not sufficiently probative of Brooks's guilt or innocence to merit an objection. Such a decision was not objectively unreasonable. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65 (1984). Likewise, although the instruction on conscious avoidance of knowledge was somewhat inconsistent with the prosecution's theory, Brooks's attorney may not have deemed the instruction objectionable because there was no evidence that Brooks consciously avoided learning what was in the bag.[2] In any event, given all the evidence of Brooks's involvement in the sale,

the absence of these instructions would not have affected the outcome of the trial. *See Strickland,* 466 U.S. at 687–96, 104 S.Ct. at 2064–69 (1984).

### 3. Failure to strike Askew's direct testimony

■ Brooks argues that the court's failure to strike Askew's direct testimony, after he asserted the Fifth Amendment privilege on cross, violated his Sixth Amendment right to confront Askew. We disagree. If a witness asserts the privilege on cross-examination regarding "collateral" matters, the witness's direct testimony need not be stricken. *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). Only if the witness's assertion of the privilege "precludes inquiry into the details of his direct testimony" so that "the defense is deprived of the right to test the truth of his direct testimony," must the court strike it. *Id.*

■ We have held that a witness's testimony about other unrelated crimes may be collateral. *Dunbar v. Harris,* 612 F.2d 690, 694 (2d Cir.1979) (affirming a refusal to strike the direct testimony of a witness who took the Fifth Amendment about his "involvement in drug dealings other than those for which appellant was charged"); *see also United States v. Berrio–Londono,* 946 F.2d 158 (1st Cir.1991) (affirming a refusal to strike the direct testimony of a co-conspirator who took the Fifth Amendment about prior drug deals with a co-conspirator other than the defendant), *cert. denied,* 502 U.S. 1114, 112 S.Ct. 1223, 117 L.Ed.2d 459 (1992). Here, the district court only permitted Askew to assert the privilege on topics collateral to the subject matter of this case. As the court said, regarding

> area[s which are] . . . within reason related to the plea and the subject matter of this case and not unrelated by virtue of some other transactions, the [Fifth Amendment] privilege will not apply.

Although the Sixth Amendment guarantees "an *opportunity* for effective cross-examina-

---

**2.** Brooks concedes in his brief that "the giving of this charge standing alone might not be plain

error." Appellant's Brief at 28 n.12.

tion," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985).

Askew was fully cross-examined about his involvement with Brooks and Brown in the two cocaine sales. He only declined to answer whether he had purchased drugs from Brown on other occasions. We are unpersuaded by Brooks's argument that any testimony by Askew about prior drug deals with Brown would have tended to disprove Askew's direct testimony. Askew's assertion of the privilege in these circumstances did not "preclude[ ] inquiry into the details of his direct testimony" nor "deprive[ Brooks] of the right to test the truth of his direct testimony." *Cardillo,* 316 F.2d at 611. Inasmuch as Askew's testimony should not have been stricken, his counsel cannot be faulted for his failure to move to strike it.

Affirmed.